### MEIGS, BASSETT & SLAUGHTER, Inc., v. E. I. DU PONT DE NEMOURS & CO.

District Court, S. D. New York.

June 11, 1943.

Pennie, Davis, Marvin & Edmonds, of New York City (W. Brown Morton, W. Peters Blanc, and Wm. M. Kilcullen, all of New York City, of counsel), for plaintiff.

Darby & Darby, of New York City (Arthur G. Connolly, of Wilmington, Del., and

Samuel E. Darby, Jr., of New York City, of counsel), for defendant.

COXE, District Judge.

I think this case can be determined solely on the fact issue. The most that the plaintiff claims is that the supplemental contract of September 30, 1932, gave the plaintiff protection against the commercial use by the defendant of any part of the plaintiff's process. This contract was terminated on November 28, 1934, and it is not disputed that all payments according to the terms of the contract were made to the plaintiff up to that time.

The contract of September 30, 1932, contains a recital specifically referring to the processes for solvent recovery and seasoning of plastic materials "embraced in the claims of U. S. patent application 433,191, filed March 4, 1930". It was this application which later resulted in the two Bassett patents, No. 2,095,961 issued October 19, 1937, and No. 2,209,256, issued July 23, 1940. The same specification served for both patents, and, so far as applicable, discloses a process for treating celluloid sheets by immersing in a non-solvent bath or series of baths of gradually decreasing concentration and then drying the sheets by air drying. The preferred liquid of the treating bath or baths is a solution of alcohol, but it is pointed out incidentally that "a concentrated aqueous solution of common salt or sugar may be employed". The whole thought, however, is to obtain the desired seasoning result by gradually decreasing the concentration of the treating fluid.

The evidence is clear that the defendant did not use in its manufacture of celluloid sheets, after November 28, 1934, any part of the plaintiff's process as disclosed by the Bassett patents. The process which the defendant did use after that date is covered by the Crane and Field patents Nos. 1,956,-564 and 2,028,502, issued respectively May 1, 1934, and January 21, 1936. This process is described in one of the exhibits as follows: "The plastic composition having such a solvent content and heated to such a temperature that it is quite soft, is extruded through a slit-like orifice in the form of a thin continuous web directly into a liquid bath and is then passed through a series of other liquid baths until its volatile solvent content is appreciably reduced, then through a washing unit, and finally through an air dryer which completes the seasoning. The liquid used in all of the baths is the same, namely, a 20%–22% aqueous solution of sodium chloride; in the first bath this sodium chloride brine is maintained at a relatively low temperature and serves the dual purpose of hardening the plastic and removing volatile solvent therefrom. In the succeeding baths the temperature of the brine may be higher and the function of the liquid is primarily that of seasoning".

Crane and Fields testified fully regarding the development of their process over a considerable period of time, and I am satisfied that they took nothing from the plaintiff. The seasoning part of the process has nothing in common with the plaintiff's process, which was based fundamentally on the conception that the celluloid sheets could be quickly seasoned by being immersed in alcohol baths of gradually decreasing concentration. Crane and Fields do not use alcohol, the treating baths have no reduction in concentration, and the use of sodium chloride has no resemblance to the suggested use by Bassett of salt in the treating fluid. Furthermore, the use of salt to prevent clouding or "blushing" of the finished sheets was known to the defendant before the employment of the plaintiff.

The best evidence that the defendant did not take anything from the plaintiff is to be found in the long period of time that the plaintiff's process was under experimentation and trial by the defendant. The first contract was executed on May 1, 1930, and from then until June of 1932 the process was given almost every conceivable test, first at the Arlington plant, and then at Leominster, in an effort to make it work. The records in evidence show the exhaustive character and extent of these tests. Yet in June, 1932, Hagan, the defendant's employee in charge of the Leominster plant, in an exhaustive report, reached the conclusion that the process was unsatisfactory and uneconomical, and that further exploitation should be discontinued. It was largely due to this report that the supplemental contract of September 30, 1932, was signed, providing for reduced payments to the plaintiff. The total payments by the defendant to the plaintiff up to the time of the termination of the contract on November 28, 1934, amounted to over $47,000.

There may be a decree for the defendant dismissing the complaint with costs. Proposed short findings in accordance with this opinion should be submitted on notice.